***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, except for minor modifications, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At all times relevant to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer on or about October 6, 1999.
3. Defendant-employer was insured during all times relevant to this claim with WAUSAU (Liberty Mutual Insurance Company).
4. Plaintiff was employed as an installation manager and sustained an injury by accident arising out of and in the course of his employment on October 6, 1999.
5. Plaintiff sustained injuries to his left leg, left hand, bilateral shoulders, and chest as the result of his October 6, 1999 on-the-job accident. Defendants dispute that plaintiff sustained an injury or injuries to his head and/or brain or that he sustained a mental or psychological injury or injuries as the result of his October 6, 1999 on-the-job accident.
6. Plaintiff's average weekly wage during all times relevant to this claim was $980.77, yielding a compensation rate of $560.00, the maximum compensation rate allowed by statute for the year 1999.
7. Plaintiff has not worked in any capacity since February 17, 2000.
In addition, the parties stipulated into evidence an index packet of medical records and reports consisting of 281 pages as well 2 pages of additional medical records submitted on May 17, 2001.
 ***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner with some modifications and finds as follows:
 FINDINGS OF FACT
1. On October 6, 1999 plaintiff was forty-five years old, a high school graduate and an employee of defendant-employer. Plaintiff served in the Marines for approximately fifteen years before he began working for defendant-employer in June 1987. When plaintiff started working for defendant-employer, he worked as a warehouseman. During the next twelve years plaintiff moved to other positions, including serviceman and installation manager, where he supervised installers, scheduled work orders and also worked in the field servicing and installing office telephone equipment. Plaintiff held the latter position at the time of his injury and worked up to sixty hours per week in that capacity. Plaintiff was also working a second job of six hours per week for a trucking company unloading trucks.
2. Plaintiff sustained a compensable injury by accident on October 6, 1999. The details of the accident could not be determined from the evidence since plaintiff had no direct memory of the fall itself and there were no witnesses. However, plaintiff was working above a drop ceiling in an office area of a textile facility when he fell through the ceiling onto the concrete floor, which was 8 to 10 feet below. When his co-worker came to assist him, plaintiff said that he was hurting all over. An ambulance was summoned. When it arrived, plaintiff advised the ambulance personnel that he remembered the incident, that he had not experienced loss of consciousness or confusion and that he was having pain in his left shoulder, left hand, chest wall and back.
3. At the emergency room, plaintiff was noted to weigh 370 pounds and was reported to have landed on his left side. X-rays revealed dislocations of the PIP joints of his left third and fourth fingers. Plaintiff was admitted to the hospital for observation under the care of Dr. Susan Pabst who diagnosed a pulmonary contusion. After his discharge from the hospital, plaintiff saw Dr. John de Perczel, an orthopedic surgeon, on October 12, 1999 for the bruising to his chest wall and to his shoulders. Plaintiff subsequently developed considerable swelling of his left knee and Dr. de Perczel aspirated fluid from the joint. Plaintiff's knee remained symptomatic despite conservative treatment, so Dr. de Perczel ultimately performed arthroscopic surgery which gave plaintiff relief from many of his symptoms.
4. Although a Form 60 was not in the Industrial Commission file, defendants apparently admitted liability for plaintiff's injury and paid for plaintiff's medical treatment at the hospital and by Dr. de Perczel. Plaintiff returned to work the Monday following the injury in a light-duty capacity at the warehouse. Although he did not go out to jobs in the field, plaintiff provided technical expertise regarding the various projects being performed. Plaintiff was an experienced, knowledgeable and conscientious employee, and the company relied heavily upon his expertise.
5. On November 19, 1999 plaintiff went to his family doctor, Dr. John H. Bowen, complaining of amnesia. Plaintiff advised Dr. Bowen that he had no recollection of what had happened when he fell and that he had had a slight head injury but nothing severe enough to account for his degree of amnesia. Dr. Bowen was concerned that plaintiff had lost consciousness when he fell and ordered an MRI and EEG. When plaintiff returned on December 6, 1999, Dr. Bowen informed him that the test results were unremarkable and Dr. Bowen could not identify a neurologic reason for plaintiff's syncopal episode. However, Dr. Bowen referred plaintiff to a neurologist.
6. Plaintiff had experienced problems before his fall at work with two episodes of altered consciousness and had been treated for anxiety and sleep apnea. The sleep disorder dated back to at least September 1995. Plaintiff underwent a sleep study in 1997 which revealed abnormalities, but the problems were not severe enough at that time to warrant surgery or use of a CPAP machine. During the next two years, plaintiff reported being under considerable stress due to family issues. His son had psychiatric problems and was very difficult to manage, which caused problems at home and at school. Plaintiff's son was hospitalized on at least one occasion, was in a halfway house at one time and was being considered for a group home in July 1999. Additionally, plaintiff's wife stopped working due to multiple health and psychiatric problems, which caused some financial strain. During this period plaintiff reported symptoms of anxiety and fatigue as well as problems sleeping. He had an episode of possible loss of consciousness while driving in approximately May 1999 when he suddenly did not know where he was while driving down a familiar road. In July 1999 Mrs. Irby expressed concern because of the stress plaintiff was under and because he was doing unspecified "strange" things. It was in part due to these prior symptoms that Dr. Bowen referred plaintiff to a neurologist.
7. On December 30, 1999 plaintiff was evaluated by Dr. Richard W. Marcus, a neurologist, regarding the episodes of altered consciousness. Dr. Marcus was advised of plaintiff's past problems with anxiety, the incident of being lost the previous May, and problems with spells of disorientation, mood swings and binge eating during sleeping hours. Dr. Marcus ordered several diagnostic tests, but the only problem he specifically identified was moderately severe sleep apnea for which a CPAP machine was prescribed.
8. Plaintiff and his wife went to Dr. Bowen in January 2000. Mrs. Irby reported that plaintiff was behaving erratically, was having crying spells and was depressed. Dr. Bowen referred plaintiff to Dr. Mark A. Graham, a psychiatrist, who began to see him on January 26, 2000. Dr. Graham subsequently concluded that plaintiff had sustained a personality change secondary to a closed head injury during the fall at work, and prescribed various medications to treat the symptoms. On February 11, 2000 plaintiff and his wife returned to Dr. Bowen and Mrs. Irby reported that plaintiff was having wild dreams and was acting somewhat irrationally and immodestly. Consequently, plaintiff was sent to Gary Indenbaum, Ph.D, a neuropsychologist, for evaluation. Plaintiff's neuropsychological evaluation with Dr. Indenbaum took place on February 16 and May 9, 2000. Mrs. Irby advised Dr. Indenbaum that plaintiff had experienced personality changes, that he was acting impulsively and that he was using poor judgment. Plaintiff reported problems with not thinking clearly, feeling confused and not remembering things well. Despite the reported difficulties, plaintiff scored very well on cognitive and memory testing with an above normal IQ and with strong abstract problem solving abilities.
9. Dr. Indenbaum found that plaintiff was functioning at a very high level of cognitive skills and that his abilities were generally consistent with intact frontal lobe functions. However, the MMPI results were consistent with symptoms of severe emotional turmoil, with obsessive tendencies and problems making decisions. Dr. Indenbaum stated that such results on the MMPI were not usually due to an acute event and it was clear that plaintiff had been functioning at a very high level before his fall. There were also some other isolated inconsistent test results. In view of these problems and the reported personality changes, Dr. Indenbaum was not willing to say that plaintiff had not sustained a head injury.
10. In between the two visits with Dr. Indenbaum on February 16, 2000 and May 9, 2000, Mrs. Irby took plaintiff to the hospital because he had been acting especially agitated and irritable and, after an argument with her, had decided to walk home down the center of a highway. There were multiple other signs of sexual disinhibition and poor impulse control. Consequently, plaintiff was admitted to the psychiatric unit on March 24, 2000 and he remained in the hospital until March 30, 2000.
11. Plaintiff stopped working at the time of his hospitalization in March 2000. Defendant-employer had no indication that plaintiff was having psychological problems and plaintiff was able to perform his job until February 17, 2000. No unusual or odd behavior was observed at work, although plaintiff had a disagreement with Tom Cox, his supervisor, regarding an issue, but the disagreement was resolved and plaintiff performed the task in question. After February 17, 2000 Mrs. Irby would not allow plaintiff to speak with Mr. Cox who did not understand why plaintiff was not reporting for work. Despite the lack of explanation, defendant-employer paid plaintiff for accrued vacation time and paid him a bonus, as well.
12. In June and August 2000 plaintiff was evaluated at the neurology department at Wake Forest University. The doctors there prescribed medication to help plaintiff be more alert but he continued to show poor judgment and impulse control and demonstrated multiple signs of a closed head injury, including flat affect, difficulty initiating conversations and problems with some frontal lobe tasks.
13. Defendants had plaintiff evaluated by Lynn Flowers, Ph. D., a neuropsychologist at the Wake Forest. The testing performed at Dr. Flowers' direction revealed results which were consistent with the tests performed by Dr. Indenbaum. Plaintiff's intellectual abilities were at least normal if not above normal and there was no evidence of cognitive dysfunction consistent with traumatic brain injury. Dr. Flowers did not observe the behavioral changes described by Mrs. Irby and, since the psychological testing would not provide significant measurement of those problems, could not substantiate them. However, Dr. Flowers acknowledged that if plaintiff were experiencing the behaviors described, there would be a strong suggestion that the injury led to personality and behavioral changes.
14. Plaintiff continued to receive psychiatric treatment from Dr. Graham until October 2000 when the doctor moved away from the area. In addition, plaintiff began seeing Tommie Smith (later Jackson), a pastoral psychotherapist associated with Baptist Hospital, in August 2000 for counseling. Ms. Smith had been the counselor for plaintiff's son and had worked with plaintiff's family since approximately 1995 regarding the son's difficulties, providing counseling regarding how the son's problems were affecting the family and how the parents should deal with the problems. Consequently, Ms. Smith knew plaintiff reasonably well before the fall at work. Ms. Smith stated that she noticed a tremendous change in plaintiff's personality following the fall. Ms. Smith stated that plaintiff had previously been assertive, aggressive, opinionated and loud, and he had presented himself as the stereotypical ex-Marine. After the injury, however, plaintiff tended to sit through sessions with his head down and his hands in his lap, avoiding participation. By July 2000 Ms. Smith was of the opinion that plaintiff could not function without supervision due to incidents where he had created a potentially hazardous situation but was unable to appreciate the danger or respond to correct the problem.
15. By order of the Clerk of Superior Court of Caldwell County filed March 8, 2001, plaintiff was found to be incompetent and his wife was appointed his general guardian.
16. After Dr. Graham moved away, plaintiff started seeing Dr. Charles Davis for his psychiatric care. Dr. Davis agreed with the diagnosis of personality change due to closed head injury. Since plaintiff's medications had been regulated through trial and error so that his condition had improved, Dr. Davis continued him on the same prescriptions.
17. Plaintiff was also evaluated by Dr. Edgardo Diez, a physician at Thoms Rehabilitation, on referral from Dr. Bowen. Dr. Diez thought that plaintiff might be able to drive again and scheduled a prescreening driver's test, which plaintiff passed. Plaintiff was then sent to Earl Rhoades, Ph. D, another neuropsychologist, for a current evaluation. Dr. Rhoades tested plaintiff on February 7, 2001. The test results indicated that there had been some decline in plaintiff's IQ scores, which may have been due to his medication. There were no deficits or changes in plaintiff's attention or concentration, and he still tested well on abstract reasoning. Dr. Rhoades concluded that there was no general trend of marked cognitive decline but that plaintiff had sustained a mild, traumatic brain injury evidenced in the form of frontal lobe syndrome with personality changes including performing repetitive behaviors, such as constant wringing of his hands, loss of inhibition, problems with impulse control and problems with non-goal-directed behaviors. The symptoms plaintiff was exhibiting were not well measured by neuropsychological testing, so subjective measures and observation of behavior were necessary in order to make the diagnosis.
18. Dr. Rhoades explained the reasons plaintiff was able to work for defendant-employer for the five months after the fall:
 I believe the problems that we described, as related to frontal lobe syndrome and changes in personality and emotion would make him more susceptible to ongoing stress over time in performing that job. So that while he might be able to cognitively perform some of the functions to do that on [a] time efficient and repetitive basis, as we might expect him to do under competitive employment, in that situation, he would not be able to sustain it over time. [Deposition p. 53]
 I think the return to work and its eventual failure is further confirmation of the fact that he cannot sustain that level of performance; and that would be a compatible finding with someone who had relatively intact cognitive abilities, as demonstrated throughout his evaluations, but who, in effect, had significant compromises in personality and emotions such that the job over time would wear him down. [Deposition p. 55]
19. Although plaintiff had preexisting anxiety disorder and sleep apnea, his behavior worsened and became significantly different following the fall. The Commission finds the testimony of Mrs. Irby and Ms. Smith credible regarding the personality changes experienced by plaintiff after the fall.
20. The greater weight of the evidence shows that plaintiff injured his head in the fall, based upon the nature of the fall and the nature of the symptoms plaintiff developed later. Drs. Marcus, Graham, Diez, Davis and Rhoades attributed plaintiff's condition to a closed head injury sustained as a result of the fall, based upon their personal observations and examinations of plaintiff, his history and test results. Dr. Rhoades indicated that a head injury could have impaired plaintiff's ability to be a reliable historian immediately after the fall due to an alteration in consciousness. Dr. Davis believed that a head injury was the best and most reasonable explanation for plaintiff's on-going psychiatric problems. No other cause has been identified. The Commission gives greater weight to the opinions of Drs. Marcus, Graham, Davis, Diez and Rhoades than to Drs. Idenbaum and Flowers, who based their opinions on limited observations of plaintiff.
21. Consequently, despite the lack of direct evidence of a head injury, plaintiff is found to have sustained a closed head injury which caused some mild, traumatic brain damage which subsequently manifested itself in the form of personality changes. Plaintiff became withdrawn and passive, had difficulty initiating conversations, had a lack of judgment in social interactions, became disinhibited regarding sexual matters and experienced difficulty controlling impulses.
22. Due to the October 6, 1999 injury at work, plaintiff was unable to work in any capacity from February 18, 2000 through the date of the Deputy Commissioner hearing on March 5, 2001. Plaintiff has not yet reached maximum medical improvement so no findings are made regarding the permanent impairments or disabilities he may have sustained as a result of the accident.
23. Although defendants admitted liability for the physical injuries plaintiff sustained in his fall at work, they denied liability for plaintiff's alleged head injury. Defendants had grounds for denying the head injury since there was no notation of such by ambulance personnel or emergency room staff and plaintiff told his supervisor shortly after the injury that he did not think that he had hit his head. In addition, plaintiff had some pre-existing psychological problems.
 ***********
Based upon the findings of fact and conclusions of law, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a mild, traumatic brain injury as a result of the October 6, 1999 injury by accident which caused personality changes and symptoms that have been labeled as frontal lobe syndrome. N.C. Gen. Stat. § 97-2(6); Click v. Pilot Freight Carriers, Inc., 300 N.C. 164,265 S.E.2d 389 (1980).
2. As a result of the compensable injury by accident, plaintiff was disabled and is entitled to compensation for temporary total disability at the rate of $560.00 per week from February 18, 2000 and continuing thereafter until he returns to work or until further order of the Commission. N.C. Gen. Stat. § 97-29.
3. In that plaintiff was paid accrued vacation time and a bonus but not wages after February 17, 2000, defendants are not entitled to a credit for the sums paid since they were due and payable under the terms of plaintiff's employment contract. N.C. Gen. Stat. § 97-42; Estesvs. N.C. State University, 89 N.C. App. 55, 365 S.E.2d 160 (1988).
4. Plaintiff is entitled to have defendants provide all medical compensation arising from this injury by accident, including all of the evaluations and treatment provided for his brain injury. In addition, defendants shall provide a current evaluation regarding whether attendant care for plaintiff is necessary. N.C. Gen. Stat. §§ 97-2(19); -25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay compensation to plaintiff for temporary total disability at the rate of $560.00 per week from February 18, 2000 through March 5, 2001 and continuing until he returns to work or until further order of the Commission. That portion of this compensation which has accrued shall be paid in a lump sum. This award is subject to the attorney's fee approved below.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of this injury by accident, including those arising from the evaluations and treatment provided for his brain injury.
3. Defendants shall provide a current evaluation regarding whether attendant care is necessary. Because there is insufficient evidence on this issue before the Commission at this time, this Opinion and Award does not address the issue of attendant care. However, in the event that the parties should be unable to agree on the issue of attendant care, either party may request a hearing before the Industrial Commission to resolve this issue.
4. An attorney's fee in the amount of twenty-five percent of the compensation awarded is approved for plaintiff's counsel. Defendants shall pay plaintiff's attorney one-fourth of the accrued compensation and every fourth check of future compensation.
5. Defendants shall pay an expert witness fee in the amount of $435.00 to Tommie Smith Jackson, to the extent this has not already been paid.
6. Defendants shall pay the costs.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING WITH A SEPARATE OPINION
 S/______________ RENE C. RIGGSBEE COMMISSIONER